

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 21, 2023

**BY ECF**

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

>    Re:    *United States v. Vague Tergalstanyan*, 21 Cr. 444 (JSR)

Dear Judge Rakoff:

The Government respectfully submits this letter in advance of the sentencing of Vague Tergalstanyan, a/k/a "Vahe," a/k/a "Vic" ("Tergalstanyan" or the "defendant") in the above-referenced matter, currently scheduled for June 23, 2023, at 2:30 p.m. For the reasons explained below, a sentence within the Stipulated Guidelines Range of 87 to 108 months' imprisonment would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

## I.  Background

>    1.  <u>Offense Conduct</u>

For years, Tergalstanyan and his partner and co-defendant Yosef Cohen laundered large sums of money on behalf of organized criminal enterprises operating in several countries around the world. In recorded conversations with undercover law enforcement officers (the "UCs") who represented themselves to be members of an international organized criminal enterprise that distributed narcotics and laundered money, Tergalstanyan and his co-conspirators planned money laundering transactions of narcotics proceeds and discussed moving tens of millions of dollars of illicit money – primarily narcotics proceeds – on behalf of international criminal organizations. Additionally, on several occasions, Tergalstanyan and co-conspirators arranged for UCs to pick up narcotics proceeds in cash from locations in the United States and then deliver clean cash to the conspirators. (PSR ¶ 16). Tergalstanyan, Cohen, and the UCs also discussed moving thousands of pounds of marijuana across the United States. Finally, Tergalstanyan and Cohen planned, in recorded conversations with the UCs, to import thousands of kilograms of cocaine from Costa Rica and Colombia into the United States. (PSR ¶¶ 29, 32-39).

This case arose from a long-running investigation by the Federal Bureau of Investigation ("FBI") into Israeli-based organized criminal syndicates. Tergalstanyan's partner, Cohen, was first referenced in the investigation when co-defendant Igal Ben Hanan mentioned Cohen to UCs while they were in the midst of a large-scale drug trafficking transaction in Amsterdam; Ben Hanan indicated that Cohen could help the UCs launder large amounts of cash. (PSR ¶ 20). Ben

Hanan thereafter facilitated an introduction of the UCs to Cohen and Tergalstanyan.   At the introductory meetings with the UCs, Cohen explained, among other things, that he and Tergalstanyan laundered approximately $3 million every month.  (PSR ¶ 21).

Thereafter, Cohen and Tergalstanyan arranged with the UCs to conduct several pickups of narcotics proceeds from various parts of the United States, including the following attempted or completed transactions.

- On April 26, 2019, at Cohen and Tergalstanyan's direction, UCs picked up $91,120 in narcotics proceeds in St. Louis, Missouri.  Following the pick up on the same day, a UC delivered $89,755 in cash (minus a 1.5% fee) to Tergalstanyan in California. Also present with Tergalstanyan at the money drop was Cohen's son. When delivering the money to Tergalstanyan, the UC explained how he launders money. Tergalstanyan responded that he similarly helps get money into the US banking system for a variety of industries, stating: "That's what this office is for." During the conversation a money counter was whirring in the background. In subsequent meetings, COHEN explained that the cash that needed to be moved was the proceeds of marijuana sales.  (PSR ¶ 22).

- On July 23, 2019, Cohen asked a UC in a recorded phone call if the UC could pick up $200,000 from New York and deliver it to Los Angeles. The UC indicated he could do the pick-up for a 3% fee. The pick-up did not actually occur, however.  (PSR ¶ 25).

- On September 9, 2019, Cohen, Tergalstanyan, Ben Hanan, and a UC discussed a potential cash pick-up in Chicago. On September 12, 2019, a UC attempted to pick up approximately $1 million cash in Chicago as arranged by Cohen, but the transaction ultimately did not happen.  (PSR ¶ 23).

- In October 2019, Tergalstanyan arranged a cash transfer in which UCs picked up $208,000 in cash from Medford, New York. Several days later, UCs delivered $203,850 (the $208,000 minus a fee of $4,150) to Tergalstanyan at his and Cohen's office in Los Angeles.  (PSR ¶ 26).

- On May 15, 2020, Tergalstanyan, and a UC discussed the UC doing cash pick-ups in New York of $1 million to $2 million per week in connection with a marijuana trafficking organization. The UCs would collect the cash and send a wire to Tergalstanyan as directed. Tergalstanyan said he would charge 4% for his role in the laundering and would split the proceeds with the UCs. These money pick-ups did not ultimately occur.  (PSR ¶ 30).

- On June 25, 2020, UCs picked up approximately $182,980 in cash in Chicago at the direction of Tergalstanyan.  (PSR ¶ 31).

In the course of these drug money pick ups in 2019 and 2020, Cohen also conspired to obtain a fraudulent U.S. visa for Ben Hanan.  In particular, Cohen arranged for the UCs to provide Cohen

with $150,000 in cash—money the UCs made clear had not yet been "washed through the system"—to be used to help make it appear that Ben Hanan had legitimate business investments so that he could obtain a business visa to reside in the United States. Later, in 2020, Cohen transferred funds back to the UCs as repayment, through wire transfers from a supposed construction company.  (PSR ¶ 24).

In addition to this visa fraud, and in addition to laundering narcotics proceeds, Cohen and Tergalstanyan attempted to arrange large drug transactions with the UCs that never came to fruition.  Several of these discussions concerned marijuana trafficking, including the following discussions.

- At a July 15, 2019 meeting among Cohen, Cohen's son, Tergalstanyan, and a UC, Cohen explained that they worked with an individual who grew marijuana at a facility in Las Vegas and wanted to supply to the East Coast but did not want to take the risk of delivering it. Cohen asked the UC if the UC's organization could deliver the marijuana, which Cohen said would be 500 pounds per shipment. Although the UC initially suggested using a plane, Cohen and Tergalstanyan thought that using trucks with "dummy loads" would be a more economically viable approach. The UC said he would get back to them about a price in the next few days.  (PSR ¶ 33).

- In subsequent calls in July 2019, after the UC quoted Cohen a price for shipping marijuana of $150 per pound, Cohen told the UC that "his guy" was currently moving 1,000 pounds of marijuana per week.  (PSR ¶¶ 34-35).  At a July 31, 2019 meeting among Cohen, Tergalstanyan, and a UC, Cohen explained that the company he currently used packed the marijuana in trucks with vegetables or furniture, because it was difficult for dogs to detect the odor.  (PSR ¶ 36).

Cohen and Tergalstanyan's most significant attempted narcotics transactions with the UCs pertained to the transport of tons of cocaine and tens of millions of dollars from Costa Rica and Colombia.  (*See* PSR ¶¶ 29, 37-38).  While these transactions did no ultimately take place, the intent of Tergalstanyan and Cohen is reflected in recorded calls with the UCs.

       (a)  <u>Costa Rica</u>

Beginning in January 2020, Cohen and Tergalstanyan began discussing with the UCs using the UCs' purported criminal enterprise to transport $60 million as well as cocaine out of Costa Rica to Los Angeles or New York.  Tergalstanyan indicated to the UCs that the quantity of cocaine to be moved was at least one ton, and that the delivery could be a regular occurrence. (PSR ¶ 29, 37).

Specifically, on February 18, 2020, Tergalstanyan called the UC and said that he would FaceTime the UC to show him something that he was writing.[1]  Tergalstanyan and the UC then

---

[1] A transcript of the February 18, 2020 call—prepared for the *Fatico* hearing for co-defendant Yosef Cohen—is attached as Exhibit A.

had a video call where Tergalstanyan drew and showed the UC the following image, in sum and substance[2]:



During the video call, Tergalstanyan explained: "I wrote some stuff down and I was trying to have you take a look at it. And you tell me yes or no."  (Ex. B, at 2).[3]  Tergalstanyan then explained that Costa Rica ("CR") is "where it is"—*i.e.*, where the ton ("1 ton") of cocaine kilos ("blocks") are—and the UC could move them to Los Angeles ("LA") or New York ("NY").  (*Id.* at 3).  The UC said he could move the cocaine, referencing his "Australian friend."  (*Id.* at 3). The UC also noted that "something happened" in Costa Rica recently—a reference to the largest cocaine seizure in Costa Rica's history, in which five tons of cocaine were seized from a shipping container, and which had occurred on February 16, 2020, just two days prior.[4] (Ex. B, at 4).  Tergalstanyan understood the reference and replied that they would wait one month at least "until everything cooled off." (*Id.*).  Tergalstanyan and the UC then agreed that the destination would be New York, and that one ton of cocaine was the "minimum" for the deal.  (*Id.* at 5-6). The two agreed to have a face-to-face meeting in Las Vegas.  (*Id.* at 8).

---

[2] Following the video call, the UC drew the image that Tergalstanyan had shown him and attached it to his report of the call.

[3] A transcript of the February 18, 2020 video call—prepared for the *Fatico* hearing for co-defendant Yosef Cohen—is attached as Exhibit B.

[4] *See, e.g.*,  https://www.theguardian.com/world/2020/feb/17/costa-ricas-largest-drugs-bust-nets-five-tonnes-of-cocaine-bound-for-netherlands.

On March 8, 2020, Tergalstanyan and Cohen met with the same UC and an Australian UC for dinner in Las Vegas.  In the course of the several-hour dinner, the four again discussed the movement of ton-quantities of cocaine, as well as tens of millions of dollars, from Costa Rica, with the Australian UC posing as an expert in illicit shipping.[5]

(b)  Colombia

A few months later, in a pair of June 17, 2020 calls between Tergalstanyan and the same UC,[6] Tergalstanyan discussed with the UC the movement of 14 tons of cocaine out of the jungle in Colombia.  In the first call, Tergalstanyan explained his "guy from CR [Costa Rica] was here" and there are "warships, sitting over there" in Costa Rica.  (Ex. D, at 3).  Tergalstanyan said his co-conspirators were still interested in moving forward and had "some stuff sitting over there, about, uh, 14, uh, big . . . uh, material . . . but it's in 'C' [Colombia]"—and was, more specifically, "sitting in the woods in Cali."  (*Id.* at 3-4).  The UC said he could do it, and the two discussed a further meeting, but the transaction never materialized.

2.  Procedural History

On July 8, 2021, a grand jury returned the Indictment charging Tergalstanyan with one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).  On December 22, 2022, Tergalstanyan pleaded guilty, pursuant to an agreement, to Count One of the Indictment.  The parties stipulated in the plea agreement that 87 to 108 months' imprisonment is the applicable Guidelines range (the "Stipulated Guidelines Range").  The Presentence Report, like the plea agreement, calculated the applicable Guidelines range as 87 to 108 months' imprisonment.  The Probation Office recommends a sentence of 60 months' imprisonment.  (PSR at 26).  Tergalstanyan requests a sentence of time served.  (Dkt. 93, at 11).

II.  **Discussion**

A.  **Applicable Law**

The Sentencing Guidelines provide strong guidance to sentencing courts after *United States v. Booker*, 543 U.S. 220 (2005).  Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings.  *Id.* at 49.

---

[5] Selected transcripts of the dinner—prepared for the *Fatico* hearing for co-defendant Yosef Cohen—are attached as Exhibits C, D, E, F, and G.

[6] Transcripts of the June 17, 2020 calls—prepared for the *Fatico* hearing for co-defendant Yosef Cohen—are attached as Exhibits H and I, respectively.

After making that calculation, the Court must consider the factors outlined in 18 U.S.C. § 3553(a), which provides that a sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established [in the Guidelines];
>
> (5) any pertinent policy statement [issued by the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Although the Court may not presume the reasonableness of a within-Guidelines sentence, the Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." (quotations omitted)).

## B.  The Court Should Impose a Sentence Within the Stipulated Guidelines Range

In this case, the nature and seriousness of the defendant's offense, the need to promote respect for the law, and to provide just punishment, all weigh in favor of a sentence within the Stipulated Guidelines Range.  Such a sentence is necessary to serve the purposes of sentencing.

The wide-ranging, deleterious effects of the narcotics trade are well-documented, and the defendant was an essential component of an international criminal enterprise that trafficked narcotics for personal enrichment. Money laundering transactions are serious because such transactions are "part of a chain, a link . . . which, if you took them away, these various links, the drug traffickers would find it extremely difficult to operate." *United States v. Rosenthal Hidalgo*, No. 13 Cr. 413 (JGK), Dec. 15, 2017 Sent. Tr., ECF No. 266). Without individuals like the defendant laundering the proceeds, the purpose underlying the distribution of narcotics— making money for those who would engage in such conduct—would be defeated. Those who participate in laundering proceeds of narcotics trafficking and/or other illicit activities facilitate those activities by, among other things, assisting in concealing and disguising the nature and origins of the funds.

By the recorded admissions of Tergalstanyan and Cohen, they were laundering $3 million *every month*. Cohen discussed with the UCs moving up to *$60 million* out of Costa Rica. Over several months, Tergalstanyan and Cohen laundered hundreds of thousands with the FBI alone. Based on Tergalstanyan's and Cohen's own words and the significant money laundering operations they engaged in with the FBI, it is beyond cavil that Tergalstanyan was a major international money launderer for organized criminals and drug traffickers.

Yet the defendant's discussions and work with the UCs encompassed more than money laundering. The defendant also spoke to the UCs about moving thousands of pounds of marijuana across the United States as well as moving thousands of kilograms of cocaine—each ton being 1,000 kilograms of cocaine—into the United States. That the planned movement of tons of cocaine into the United States did not actually take place does nothing to undermine Tergalstanyan's criminal intent or the seriousness of his conduct—and the concomitant need to promote respect for law and provide just punishment.

Further, whereas co-defendant Cohen lied to Probation about his conduct with respect to the attempted importation of thousands of kilograms of cocaine, Tergalstanyan in his sentencing submission appears to pretend as if that evidence does not exist, making claims that are contradicted by that evidence. (*See* Dkt. 93 at 8 (quoting Tergalstanyan's letter to the Court, where Tergalstanyan claims, incredibly, that "[t]he whole matter really was about some $482K dollar money exchange")). In his letter to the Court, Tergalstanyan goes on to claim that:

> I trusted people who I shouldn't have, and overlooked clear signs that things were not legal. The person who I got involved with was a lifelong criminal which I had no clue about and an international drug dealer who I found out later. I guess the excitement of finally engaging with someone who pretended to have the investors we were looking for on a few Business Projects blinded me from reality. In my 22 years of being in business and the real world, I never was involved with or associated myself with these types of people, and had I known from the beginning who they were, I would have never done anything with them.

(Dkt. 93-10, at 2). Those claims do not withstand even passing scrutiny. In reality, and among other things, it was *Tergalstanyan himself* who first proposed the ton-quantity cocaine

importation scheme to the UC, referencing and liaising with his own contacts to the Mexican cartels.

Similar to Cohen's outright lie to Probation in connection with his Presentence Report, Tergalstanyan's minimization and distortion of clear facts to this Court, even after he has pled guilty and is facing sentencing, raises serious concerns about his acceptance of responsibility and about recidivism—particularly for a significant player in international organized crime. Perhaps most strikingly, it evinces a complete lack of respect for the law. For these reasons, and to reflect the seriousness of the offense, impose just punishment, and promote respect for the law, a sentence within the Stipulated Guidelines Range is warranted.

## III.  Conclusion

For the reasons set forth above, the Government respectfully submits that a sentence within the Stipulated Guidelines Range of 87 to 108 months' imprisonment is sufficient but not greater than necessary to serve the purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
     Micah F. Fergenson
     Assistant United States Attorney
     (212) 637-2190

cc:    Edward Sapone, Esq. (by ECF)